ELLEDGE *v.* AETNA LIFE INS. CO.

5-3955                                          406 S. W. 2d 374

Opinion delivered October 3, 1966

*Terral, Rawlings, Matthews & Purtle,* for appellant.

*W. M. Lee,* for appellee and cross-appellant.

*Owens, McHaney & McHaney,* for appellee.

CARLETON HARRIS, Chief Justice. Aetna Life Insurance Company, on August 1, 1929, issued Policy P648527, in the amount of $5,000.00, and on October 21, 1934, issued Policy P722610, in the amount of $6,000.00, upon the life of William Gustavus Elledge, Helen N. Elledge,

wife, being named as beneficiary. Some time in 1956 Mr. Elledge became disabled; under terms of the policy, premiums were waived, and these policies were in full force and effect on July 12, 1964, when Mr. Elledge died.

Pertinent facts in this litigation are as follows:

On May 30, 1959, Mr. and Mrs. Elledge entered into a property settlement agreement in contemplation of divorce, in which these two policies, along with other policies, not here at issue, are referred to as follows:

"It is mutually agreed and understood that as to the insurance policies described in item No. 6 above, each of same is on the life of Husband and have as beneficiary Wife. It is further agreed and understood that Husband will not change the beneficiary on any of said policies and will not borrow on same nor surrender same for cash value, they being hereby considered and designated as the property of Wife."

The parties were subsequently divorced in Monroe County, Arkansas, the decree incorporating the property settlement agreement, and reciting

"* * * that the property settlement agreement hereinabove set out be, and hereby is, approved and ratified in all respects and is hereby declared by the court to be finally conclusive of any and all property rights between the parties hereto."

Thereafter, in March, 1961, Elledge, who had previously obtained loans from the company on these two policies,[1] made a request that Aetna grant to him the maximum loan on each policy. The company complied with this request, and increased the loan on P722610 by $2,258.91, and also increased the loan on P648527 by $2,048.27.

---

[1]Elledge had borrowed $498.88 on Policy P722610, and $435.59 on Policy P648527.

On December 12, 1961, and January 8, 1962, Elledge directed letters to the insurance company, advising that he desired to change the beneficiary of these policies, and the company sent him Chance of Beneficiary forms. He also advised that his wife had the policies. Elledge completed the forms, naming Ruby E. Patton, one of the appellees herein, as the new beneficiary. Aetna declined to make the change until the policies were surrendered for endorsement. This was never done, and the endorsements, changing beneficiaries, were never made.

On December 18, 1963, Mrs. Elledge wrote to Aetna, advising that the policies, here in litigation, had been assigned to her as of July 9, 1959, and Aetna promptly informed appellant that it was necessary that a certified copy of the property settlement be sent to it, if the company was to be governed by the terms of the agreement. On February 10, 1964, Mrs. Elledge mailed a certified copy of the settlement to the insurance company, and receipt was subsequently acknowledged.

On July 6, 1964, appellant instituted suit against Mr. Elledge in the Monroe County Chancery Court, alleging that Elledge had violated the property agreement, *inter alia,*[2] by borrowing upon the policies, and by attempting to change the beneficiary. Mrs. Elledge asked that Mr. Elledge be held in contempt of court, because of his acts, and further, that all property owned by plaintiff and defendant be sold, and she be awarded $24,-000.00 out of his portion of the proceeds from the sale to compensate her for her loss due to the acts complained of. Six days after this suit was filed, Mr. Elledge died, and on August 19, appellant instituted an action against appellee, Atena Insurance Company, seeking recovery for the face amount of the policies herein (except for the first loans obtained by Elledge during the time of the marriage), together with penalty, interest, and a reasonable attorneys' fee. Aetna answered, setting out that Ruby Patton was claiming to be beneficiary under

[2]The property settlement included quite a bit of property not involved in this lawsuit.

the policies, and the company offered to pay into the registry of the court the difference between the face value of said policies and the amount of money due the company, because of the loans made to Elledge. It asked that Mrs. Patton be made a cross-defendant. Mrs. Patton then pleaded that Elledge had changed the beneficiary, and she prayed that the proceeds of both policies, less the amount of indebtedness to Aetna, on account of the loans, be paid to her; she also asserted that the purported property settlement between Elledge and appellant was not binding on either Aetna or herself, and the contract was ineffectual as an assignment of deceased's rights. On trial, the court found that Mrs. Elledge was entitled to the proceeds of Policy P722610, less the amount of indebtedness due Aetna on the two loans made by her ex-husband, and further found that Mrs. Patton was due the proceeds from Policy P648527, likewise less the amount of indebtedness due Aetna because of the loans. From the judgment so entered, Mrs. Elledge appeals from that portion finding that Mrs. Patton was due the proceeds under Policy P648527, and also appeals from that portion of the judgment allowing her only $2,835.57 under Policy P722610, instead of the face value of the policy (less the first loan). Mrs. Patton cross-appeals from that portion of the judgment finding that Mrs. Elledge was due the proceeds (after deductions to Aetna) from Policy P722610.

We will first dispose of appellant's contention that Aetna, in tendering the amount due under the policies, was not entitled to deduct the amounts of the second loans made to Mr. Elledge. This contention, of course, is based upon the argument of Mrs. Elledge that the policies had been assigned to her; that Elledge therefore had no right to borrow on these policies, and it is contended that the company made these loans at its own risk, since they were made without the policies being sent in to the company office.

In the "Policy Loan Agreement" executed by Mr. Elledge when applying for the second loans on the poli-

cies, the statement appears, "I hereby certify that I am not involved in any insolvency or bankruptcy proceedings. I further certify that this policy is not now assigned or transferred to any person or party except as follows:" A blank space is then provided. On these particular applications, no words are set out in the blank space. Mrs. Elledge contends that this omission should have raised the suspicion of the company to the extent that it should have made inquiry (as to whether any assignment had been made) before granting the loans.

It is difficult to see how the word, "none," would have added anything to the applications. The blank was only required to be completed *in case an assignment or transfer had been made* (by setting out the assignment or transfer), and it might well be considered that the failure to answer at all had the same effect as to write in the word, "none." It must be remembered that the validity of this argument depends on whether the company owed a duty to Mrs. Elledge. This will be subsequently discussed. It is also argued that the company should have required the policies to be sent in before making the loan. Since this could not have been done, such a requirement, says appellant, would have disclosed the fact (later disclosed when Elledge sought to change beneficiaries) that he did not have the policies, because they had been assigned. However, as earlier mentioned, Elledge had, during his marriage, borrowed on both policies, and as the policies had been endorsed at that time to show a loan indebtedness, there was no need to again require the endorsement. An endorsement, showing that a loan has been made, is solely for the company's benefit, and its purpose is to make sure that the face amount of the policy will not be paid to a claimant who owes an indebtedness to the insurance company. The first endorsement was sufficient to call that fact to Aetna's attention, and enable it to determine the total amount of the loans before settling the policy.

The principal reason why appellant's argument must fail is that she did not comply with Section 15 of

the policies until long after the loans were made. That section provides as follows:

"No assignment of this policy shall be binding upon the Company unless and until the original or a duplicate thereof is filed at its Home Office. The Company does not assume any responsibility for the validity of an assignment."

Of course, there was no way for Aetna to know of the assignment unless it was notified, and the burden of notification was very clearly placed on appellant. Apparently, she eventually discovered this requirement, for she notified the company of the assignment on December 18, 1963, and sent a certified copy of the property settlement on February 10, 1964, but this was nearly two and one-half years after the loans had been made. In *Patten* v. *Mutual Benefit Life Insurance Company*, 6 S. E. 2d 26 (South Carolina), a similar situation arose. There, one William C. Brown, on December 10, 1910, assigned an insurance policy to J. H. Patten, and at the same time delivered possession of the policy to Patten. Notice of the assignment was first given to the company on May 19, 1925, and the loans advanced to the insured were all granted before that date. The court stated the question as follows:

"* * * Could the insurer under the terms of the policy make a valid loan to the insured on the security of the policy, after an assignment of the policy without notice to the insurer and without 'receipt of the policy,' which loan would be binding on the assignee?"

In deciding this issue, the Supreme Court said:

"It is conceded that notice of the assignment was not given to the company until May, 1925. All of the loans made by the company were prior to this date. The validity of the loans is attacked upon the sole ground that the company did not require a production of the original policy at the time of making any of the loans,

except the first. It therefore follows that if the loans were sanctioned by the contract provisions, construed in the light of the general law, the plaintiff is not entitled to recover. Independent of the provisions of the policy, the law of this State, as elsewhere, seems to be clear that the debtor has the right to deal with the creditor until he has actual notice of an assignment, * * *.

" * * * And although such an assignment is good as between assignor and assignee, it has been held that it is necessary to give notice to the company in order to constitute an assignment valid as against a subsequent assignee, and free from acts of an assignor as to surrender of the policy to the office. *And the policy itself may provide that notice must be given to the company and in such a case the provision should be complied with to render the assignment as a valid one.*

"Thus under the general principles of law the company had the unquestionable right to make loans on the policy and to treat with the insured as the sole owner thereof until it received notice of the assignment."

We are of the opinion that appellant's argument in this respect is without merit.

We think the court erred in awarding the proceeds from Policy P648527 to Mrs. Patton, for there had been no change of beneficiary, and Mrs. Patton held no proper claim to the amounts due under this policy. Elledge attempted to change the beneficiary, but in this effort, was unsuccessful, for the company refused to comply with the request until the policies were sent in. Elledge was aware of the fact that the beneficiary had not been changed. However, this circumstance is not controlling. The controlling fact is that Elledge, at the time of making the request, *held no interest in the policies,* for they had been assigned to Mrs. Elledge just prior to the divorce decree. The Patton brief states:

"Here the decree of divorce merely approved the

property settlement entered into between the Elledges—it did not decree the ownership of the policies changed nor did it divest the ownership from William Gustavus Elledge and vest it in Mrs. Helen N. Elledge.''

This is to put form before substance. It is true that the agreement does not set out verbatim that Elledge is divested of any interest in the policies, but it is very evident that that is the intent of the language, the final clause, with reference to these policies, heretofore quoted, providing, *''they being hereby considered and designated as the property of wife.''* The Chancery Court also found, in approving and ratifying this agreement that it was ''finally *conclusive* of all property rights.'' Not only that, but the policies *were delivered to Mrs. Elledge*, which act was certainly in furtherance of the agreement. Thereafter, Elledge never again had his hands on the policies, and his letters to Aetna clearly show that he recognized that he could not obtain them. In *Reilly* v. *Henry,* 187 Ark. 420, 60 S. W. 2d 1023, this court, in quoting a California case, in which a similar instance was at issue, said:

'' * * * The court disagreed with both contentions, and as to the last, while holding that when the policy was first taken out the beneficiary named had no vested or equitable rights therein which the insured could not have ended at will by change of beneficiary, yet when he agreed for a consideration to keep the policy in being for the beneficiary as long as she remained single, and 'when this offer was accepted by her, the quality of her interest as a beneficiary in said policies became changed from that of mere expectancy to a more fixed and permanent relation. She had thenceforth an equitable interest in said policies of which she could not be divested by the mere act of the insured in changing the name of the beneficiary.' ''

We have reached the conclusion that Mrs. Patton had no beneficial interest in either policy, and this holding, of course, also disposes of her cross-appeal.

Appellee Mrs. Patton contends that Mrs. Elledge, by filing a petition in the Chancery Court on July 6, 1964, seeking to recover from Elledge the amounts lost by his violation of the property agreement, exercised an election of remedies. Appellee cannot prevail on this point for two reasons. For one, the complaint filed in the Chancery Court has not been abstracted, and we have said many times that it is not feasible for the justices of this court to be compelled to examine the transcript in order to acquaint themselves with pleadings, exhibits, or testimony. *Vire* v. *Vire,* 236 Ark. 740, 368 S. W. 2d 265. It is true that the appellant is due to abstract the record, but this particular exhibit was relied upon by appellee, and she was privileged, under our rules, to supply the deficiency, and ask that the cost of the additional abstracting be placed on appellant. In fact, one additional item is abstracted. Merely mentioning the exhibit in the statement of the case is insufficient to constitute compliance. Be that as it may, the argument is without merit. In 28 C.J.S., Section 1, Page 1057, ''Election of Remedies,'' we find:

''Election of remedies has been defined to be the right to choose, or the act of choosing between different actions or remedies, where plaintiff has suffered one species of wrong from the act complained of. Broadly speaking, an election of remedies is the choice by a party to an action of one or two or more coexisting remedial rights, where several such rights arise out of the same facts; but the term has been generally limited to a choice by a party between inconsistent remedial rights, the assertion of one being necessarily repugnant to, or a repudiation of, the other. Thus, in its technical and more restricted sense, election of remedies is the adoption of one of two or more *coexisting*[3] remedies, with the effect of precluding a resort to the others.

'' * * * It has been said that the doctrine is a harsh rule which is not to be extended, and that it is to be applied by the courts with a wide discretion in order

[3]Emphasis supplied.

that it may not be made an instrument of oppression. Each case involving a question of election of remedies must be governed by its facts.''

Our own cases of *Eastburn* v. *Galyen,* 229 Ark. 70, 313 S. W. 2d 794, and *Bigger* v. *Glass,* 226 Ark. 466, 290 S. W. 2d 641, point out that one of the essential conditions relating to election of remedies is that two or more remedies *exist.* That necessary element is not present in the instant litigation, for Mrs. Elledge had no cause of action against Aetna, *i. e.,* she was not due to receive proceeds of the policies, as contemplated in the argument, until *after* Mr. Elledge's death;[4] in other words, at the time the suit was filed, Mrs. Elledge did not have the remedy she is now pursuing. It might be added that, as pointed out in C.J.S., the doctrine, here under discussion, should not be extended, and to apply such a doctrine here, under the circumstances heretofore set out, would indeed be harsh.

In accordance with what has been said, that portion of the judgment finding for appellee, Aetna Life Insurance Company, is, in all things, affirmed; that portion of the judgment finding that Mrs. Elledge is entitled to the proceeds of Policy P722610 is affirmed, and that portion of the judgment finding that Mrs. Ruby Patton is entitled to the proceeds of Policy P648527 is reversed, with directions to enter judgment in favor of Mrs. Elledge to the proceeds due under this policy. Costs are adjudged two-thirds against Mrs. Patton, and one-third against Mrs. Elledge.

Cobb, J., dissents in part.

Osro Cobb, Justice, dissenting in part. I fully agree with the decision of the majority awarding all available proceeds of the Aetna Life Insurance policies to appellant, the wife and designated beneficiary in such policies.

---

[4] Of course, when appellant learned of her ex-husband's violation of the property agreement (by borrowing on the policies), it was too late to seek to prohibit the granting of the loans—because they had already been made.

I respectfully dissent from that part of the majority opinion which permits Aetna to deduct from its settlement certain loans which had not been registered or endorsed upon subject policies, in accordance with the provisions of Section 7 of the policy contracts.

Section 7 contains the following language:

"A loan agreement satisfactory to the company shall be executed and *sent with the policy* to the Company at its Home Office. The Company will *return the policy after proper endorsement.*" (Emphasis supplied)

I take the view that when Aetna, in the face of the quoted provisions of Section 7, *supra,* made loans without requiring the surrender of the policies and proper endorsement thereon as to the loans, it breached the clearly stated provisions of its own policy contract and waived its right to assert such loans as a deductible indebtedness against the policies. This is not to say that Aetna also waived its right to proceed against the estate of the deceased insured as a general creditor. *See Subd.* 2 *of* § 335 *of Act* 148 *of* 1959.

The proceeds of the policy due the designated beneficiary could not be reached by creditors, same being exempted by statute. *See* § 66-3328, *Ark. Stat. Ann. (Repl.* 1966).

Our decisions must necessarily apply equally to all insurance companies, great ethical companies like Aetna and also the nefarious companies who employ sharp practices to defeat legitimate policy claims. The provisions of Section 7 of the Aetna policies, when complied with, benefit all concerned and deviation therefrom may result in much injustice, as in this case.

Appellant knew from looking at the Aetna policies that same were encumbered by old loans, the particular endorsement used by Aetna giving no date and no

amount. Presumably, husbands and their wives work together in paying insurance premiums upon their separate or joint policies and appellant apparently knew the principal amount of the prior loans against the policies. What she did not know was that additional loans were made while she was in complete possession of the policies. Herein lies the evil of the situation.

Under the rule announced in the majority opinion, widows may no longer rely upon what the policy reflects upon its face. Indeed, when asserting her claim for the sum the policy purports to represent as due her, she may be astonished to be advised by the insurance company, whether honestly or fraudulently, that the funds have been absorbed by unendorsed loans to the insured. With the husband dead and unavailable to give testimony to refute false claims of such loans, the stunned beneficiary may become an easy victim. Moreover, an insured, with an eye for a dishonest dollar, could exhibit his policy free of loan endorsements and dupe innocent persons into relying upon his having a substantial cash equity therein, when in fact the equity had been depleted by unendorsed loans.

The General Assembly might well consider amending Section 335 of Act 148 of 1959 so as to specifically limit policy loan deductions in settlement of policy obligations to those loans which have been duly and properly endorsed upon the policy itself, such endorsements setting forth the date and amount of such loans. This would obviate misunderstandings and possible fraudulent evasions in payment of just claims. It would keep all of the pertinent facts out in the open for the information and guidance of all concerned. It certainly would work no hardship upon the insurance companies.

For the reasons stated, I respectfully dissent.